IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TERRENCE HOWARD O'NEAL | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No.: 3:20-cv-1335 |
| ULTRAVISION  TECHNOLOGIES, | § | |
| LLC, and ACTIVE | § | |
| INTERNATIONAL, INC. | § | |
| | § | |
| Defendants | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Terrence Howard O'Neal ("Plaintiff" or "O'Neal") complaining of Defendants, Ultravision Technologies LLC, ("Defendant", "Ultravision", "the Company" or "UT"), and Active International, Inc. ("Active International" or "Active") (collectively "Defendants") and for causes of action states as follows:

### I.

### INTRODUCTION

1.01    Plaintiff would show that Defendants, acting in collusion, willfully misled Plaintiff when Defendants' senior management negotiated Plaintiff's Employment Agreement. ("Agreement") Defendants through senior executives omitted key facts regarding Ultravision's operations. Less than four months of the parties' executed the Agreement, Ultravision, under the direction of its parent, Active International terminated Plaintiff's, employment as President & Chief Operating Officer. Defendants' agents told Plaintiff that he and Ultravision's entire workforce would be terminated without cause. Plaintiff presented Defendants with his "Notice of

Resignation For Good Reason" and demanded payment of his contractual severance and guaranteed incentive payments. Even though Defendants conceded their obligations to pay Plaintiff his contractual severance and incentives under the Agreement, Defendants still refuse to pay Plaintiff his contractual severance and guaranteed incentive payments.

## II.

## JURISDICTION AND VENUE

2.01     This Court has jurisdiction under 28 U.S.C. USC s 1332, because there is total Diversity between the parties and the amount in controversy is in excess of $5000.06 of costs and attorney's fees.

2.02     Venue for all causes of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. §1391.

## III.

## PARTIES

3.01     Plaintiff is an individual, who at a all times relevant herein, a resident of the state of Texas.  Claimant can be reached through the undersigned counsel.

3.02     Defendant, Ultravision Technologies, LLC is a Delaware corporation authorized to do business in the state of Texas.  Defendant's principal place of business located at 4542 McEwen Road, Dallas, Texas 75244.  Defendant may be served through its registered agent Corporation Service Company dba CSC – Lawyers Incorporating Service Company located at E. 7th Street, Suite 620, Austin, Texas 78701-3218, or wherever found.

3.03     Defendant, Active International is UltraVision's parent corporation and/or affiliate. Active International is an ESOP corporation who has conducted business in the state of Texas,

directly or indirectly, through itself or through one or more intermediaries including but not limited to Active Media, and has control or is controlled by, or is under common control with UltraVision. Active International's principal place of business located at One Blue Hill Plaza, Pearl River, NY 10965. Active International may be served upon its registered agent or any of its officers or directors, wherever found.

## IV.

## AGREEMENT TO ARBITRATE

4.01    Pursuant to the Employment Agreement (the "Agreement") between Plaintiff and Ultravision, all disputes arising under the Agreement are to be resolved through arbitration before the AAA.  A copy of the parties' Employment Agreement, containing an agreement to arbitrate, is attached hereto as **Exhibit A**.  Plaintiff timely filed a claim for arbitration with the American Arbitration Association and presented his demand for damages in the form of unpaid severance, health insurance coverage, incentives, legal fees, and all other damages arising out of Defendant's breach.

4.02    Defendant refused to comply with its own arbitration procedure and failed to pay the AAA  the requisite arbitration fees. As a result of Ultravision's failure to cooperate with its own arbitration rules, the arbitration proceedings were closed.  Now, after an unnecessary delay, Plaintiff now proceeds with the instant complaint before this Court.

## V.

## FACTUAL ALLEGATIONS

5.01    In early Spring, 2019, Plaintiff and Defendant Ultravision in conjunction with Active International, negotiated at arm's length the terms of Plaintiff's employment agreement. ("Agreement") and executed the same on or about May 24, 2019.

5.02    Participating in the negotiations were senior executive management from both Ultravision and Active International.  Specifically, Alan Elkin, Chairman and CEO at Active International, Mel Lazar, Board Member at Active International, and Jay Santamaria, Advisor to Chairman and Chief of Staff at Active International, participated in the negotiations.

5.03    Active International essentially conducted all of the negotiations without the knowledge of the CEO of Ultravision.  Specifically, Jay Santamaria ("Santamaria"), Active's Chief of Staff, first contacted Plaintiff in June 2018, approximately six (6) months before being introduced to the CEO of Ultravision.  Mr. Santamaria stated further that Ultravision's CEO Bill Hall ("Hall") was not trusted.  Plaintiff discovered that the management of Active International and Ultravision are so intertwined such that one is the alter ego of the other.

5.04    From January to April, 2019, Active International stated that they could not bring Plaintiff on until UltraVision had proper funding to run the company.

5.05    On March 19, 2019, Alan Elkin ("Elkin"), CEO for Active, told Plaintiff in a phone call that it would be morally wrong to bring Plaintiff on board with the company without sufficient funding to bring the company forward.

5.06    Elkin told Plaintiff that UltraVision would obtain funding by either: (a) securing additional financing from Longford Capital; or (b) securing the order from Clear Channel UK which came with a 50% deposit.  One of these two (2) funding sources needed to be finalized before Plaintiff could be signed on.

5.07    On April 9, 2019, Hall emailed Plaintiff to confirm that the financing from Longford would be available by May 15, 2019, at which time UltraVision would have sufficient funding to run the company.  Financing from Longford actually arrived between May 15, 2019 and May 24, 2019.

5.08    Under the terms of the Agreement, the parties agreed that Plaintiff would assume the role of President & Chief Operating Officer for an initial term of three (3) years at an annual salary of $350,000 ("base salary").

5.09    The Agreement further provided that Plaintiff would receive an incentive bonus with the target amount of $250,000 if Plaintiff met or exceeded the annual performance objectives and operating metrics in Schedule B of the Agreement.

5.10    Defendant Active International guaranteed that Plaintiff would receive an incentive bonus of $50,000 in 2019, and $100,000 in 2020 ("Guaranteed Incentive Bonuses"). These amounts were payable if Plaintiff was terminated without cause or resigned for good reason during the four (4) month period prior to the normal bonus payment dates.

5.11    The terms "Termination without Cause" and "Resignation for Good Reason" are defined in Paragraph 6.4 of the Agreement, which states in pertinent part:

> "In the event of such termination (Termination Without Cause or Resignation for Good Reason), the Employee (Claimant) shall be entitled to receive the accrued amounts, and subject to the Employee's compliance with Sections 7, 8 and 9 of this Agreement and his execution of a release of claims in favor of the Company, its affiliates, and their respective officers and directors in a form provided by the company (the "Release"), the Employee shall be entitled to receive: (i), continued base salary for 12 months (Severance Payments) following the termination date payable in equal installments in accordance with the company's normal payroll practices; (ii) COBRA coverage until the end of the severance or until Employee becomes eligible for another employers groups health plan, whichever occurs first; (iii) if the annual performance objectives are met for the year in which termination occurs, the incentive bonus prorated for the number of days from the start of the year until the termination; and (iv) any remaining amounts to be paid under the phantom plan (in respective rights that it invested and exercise under Fenton unit plan) on the date for date such payments are required pursuant to the Fenton unit plan; any unvested or exercise rights under the Fenton unit plan as of the termination date shall be forfeited."

(See **Exhibit A**)

---

5.12    On or about September 12, 2019, Plaintiff was informed in a conference call with company board members and senior executive managers Mel Lazar ("Lazar") and Gary Steinbeck ("Steinbeck") that Defendant intended to terminate all employees, including Plaintiff, effective September 13, 2019.  At no time did Plaintiff engage in conduct that would be grounds for termination.

5.13    Defendant failed to give Plaintiff the requisite 30 days' notice of its intention to terminate Plaintiff's employment.  In the same conference call, Defendant confirmed that Plaintiff was not being terminated "for cause" as that term is defined in the Agreement.

5.14    Defendant's stated reason given for the termination was that it had changed its strategic direction and was ceasing operations. Defendant's board of directors then directed Plaintiff to terminate all Ultravision employees effective September 13, 2019.

5.15    In the same September 12, 2019 conference call, Defendant's board acknowledged Defendant's contractual obligations to Plaintiff with regard to severance, back pay, unreimbursed expenses and incentives.  Defendant further represented to Plaintiff that he would not be bound by any noncompete clause more fully described under Section 9 of the Agreement.  A copy of Steinbeck's November 1, 2019 correspondence is attached hereto as **Exhibit B**.

5.16    In the course of the conference call, Plaintiff learned from Mel Lazar that Hall, while acting as CEO of UltraVision, had mismanaged certain funds for unauthorized purposes. Defendants had not disclosed these facts during the negotiations for Plaintiff's Employment Agreement and deliberately withheld this information from Plaintiff with the intent that Plaintiff would rely on the representations and would enter into the Agreement.

5.17    When Plaintiff arrived to begin managing UltraVision, Plaintiff discovered that the company had already spent the financing provided by Longford and had applied the financed funds

to other ongoing liabilities, that would later be determined, which should have been ear-marked for payment to other service providers who were expressly identified in the lending agreement. Consequently, there was no money left for Plaintiff to successfully run the company operations. Plaintiff further discovered that UltraVision had used the money earmarked for Plaintiff's use to run the company before the employment agreement was signed on May 24, 2019. Defendants withheld this information from Plaintiff throughout the negotiations.

5.18    Plaintiff did not discover this until after he reported to UltraVision.   In a closed-door meeting with "Tandy Robinson ("Robinson"), UltraVision's Finance Director and Dan O'Brien ("O'Brien") UltraVision's counsel,  O'Brien and Robinson disclosed to Plaintiff that Ultravision's CEO,  Hall had misdirected the funds, contrary to the terms dictated by the Longford lending agreement.  Robinson wanted Plaintiff to be aware of this activity and to take steps to ensure there was no further mismanagement of funds.

5.19    After meeting with Robinson and O'Brien, Plaintiff immediately began an investigation into the issue of mismanagement of the funds and the trail of the funds.  On September 12, 2019, Mel Lazar confirmed that he was aware of Hall's activity.  Lazar actually disclosed this in the same meeting, where Lazar announced that everyone in the company, including Plaintiff, would need to be terminated.

5.20    These facts constitute further good reason, as that term is defined under the Agreement, for Plaintiff's resignation from Ultravision, without risk of forfeiture of severance.

5.21    On September 13, 2019 Plaintiff, through his legal counsel, tendered to Defendant and its parent company, Active International, his Notice of Resignation for Good Reason.   A copy of said notice is attached hereto as **Exhibit C**.

5.22   In his notice of separation, Plaintiff also specifically stated what was owed to him under the terms of the Agreement, as follows:

A.  Payment of his base salary through October 13, 2019;

B.  Severance payments (12 month's salary) totaling$350,000, payable monthly;

C.  Guaranteed 2019 Bonus of $50,000;

D.  Additional unpaid vacation days be paid upon signing of this agreement (September 13 - October 13, 2019);

E.  Reimbursement of all business expenses through October 13, 2019;

F.  Reimbursement of all temporary living expenses;

G.  Reimbursement of all moving expenses up to $58,000 to be paid directly AND to include any lease cancellation fees and additional storage charges for Plaintiff's Dallas apartment not foreseen in the original agreement due to early termination;

H.  12 months' insurance coverage whether under COBRA ($618.70/month x 12) or paid for separately;

I.  Legal fees in conjunction with this employment agreement; and

J.  Tax impact of the $67,000 moving expenses and temporary living expenses of approximately $30,000.00.

5.23   Plaintiff performed all conditions precedent under the Agreement for the aforementioned payments.

5.24   As of this date, Defendant has neglected and refused to pay that which is listed in section 5.22 above, including but not limited to Plaintiff's contractual severance, guaranteed bonus, incentive payments, COBRA coverage and tax reimbursements, all of which are due and owing under the parties' Agreement.

5.25    Plaintiff estimates his contractual damages to be approximately $616,591, computed as follows:

Summary of Separation Package:

| | |
|---|---|
| 30 Day notice period ( Sept. 13 – Oct. 13) | $ 29,167 |
| 12 Months Severance | $350,000 |
| Guaranteed Bonus | $ 50,000 |
| 12 Months COBRA @ 618.70/month | $ 7,424 |
| Tax gross-up for Moving and Temporary Living Expenses | $ 30,000 |
| 2019 and 2020 bonuses | $150,000 |
| Total | $616,591 |

5.26    On or about November 1, 2019, Plaintiff received an email from Steinbeck, CFO of Ultravision and a member of the Board of Directors of Active International, parent company of Ultravision.  In this email, Steinbeck, on behalf of Ultravision and the Board of Directors of Active International, made the following acknowledgments:

A.  UltraVision had run out of cash and was changing the focus of its operations to value its intellectual property and discontinuing the sale and manufacture of LED products.

B.  Plaintiff and all Ultravision employees were to be terminated as of September 13, 2019.

C.  Plaintiff was entitled to the severance and an additional 30 days' compensation because Defendant had not given the required 30 days' notice of Plaintiff's termination of employment.

D.  Steinbeck further assured Plaintiff's severance would be paid by Ultravision at its regular payroll intervals.

E.  COBRA payments/reimbursements were to be handled in the same manner through an additional monthly payment to Plaintiff of 125% for anticipated taxes.

F.  Plaintiff's guaranteed incentive should be prorated for the term of service as a regular full-time employee of Ultravision from May 24, 2019 through October 25, 2018, for a total of 154 days, or $21,095.89, to be paid on the first-year guarantee of $50,000.00.

G.  Plaintiff was entitled to a maximum of $58,000.00 in relocation of household goods and related costs.

See **Exhibit C**.

5.27    In the same letter, Steinbeck acknowledged that Plaintiff 's earnings as a consultant for UltraVision should not be viewed as an offset to Plaintiff's contractual severance.

5.28    Plaintiff reasonably relied on Steinbeck's statements which represent an admission by Ultravision of its obligations to Plaintiff under the parties' Agreement.

5.29.   As of today, Defendants have neglected and refused to pay Plaintiff  his severance, incentives, and other monies owed to him  under the Agreement, as described in Paragraphs 5.22 and 5.25 above.

## VI.

## FIRST COUNT

## BREACH OF CONTRACT

### (As to Ultravision)

6.01    The foregoing paragraphs of this complaint are incorporated in this Count by reference as if fully set forth at length herein.

6.02    Defendant's actions were in breach of its Agreement with Plaintiff. This breach has caused Plaintiff to incur serious and significant financial damages.

6.03    Plaintiff therefore seeks all the aforementioned contractual damages pursuant to the terms of the parties' Agreement to be paid as a lump sum.

## VII.

## SECOND COUNT

## <u>ESTOPPEL</u>

### (As to Both Defendants)

7.01    The foregoing paragraphs of this complaint are incorporated herein by reference as if fully set forth at length herein.

7.02    Defendants through their authorized agents voluntarily acknowledged its obligations under the Agreement, through its email from its Chief Financial Officer on November 1, 2019. Defendant is estopped from denying its obligations under the parties' Agreement.

## VIII.

## THIRD COUNT

## <u>FRAUD</u>

### <u>(as to Both Defendants)</u>

8.01    The foregoing paragraphs of this complaint are incorporated by reference as if fully set forth at length herein.

8.02    Defendants through their actions and representations omitted several material facts regarding the mismanagement of Ultravision and the misdirection of funds. Active International at one point recruited a headhunter to find the position for which Plaintiff was negotiating.  These

issues were known to Defendants, who deliberately withheld this information from Plaintiff during the parties' contract negotiations.

8.03    Defendants' material omissions constitute a fraudulent withholding of material information that should have been disclosed to Plaintiff. Consequently, Plaintiff had no way of knowing this information, and was therefore misled and damaged by Defendants' fraudulent omissions.

8.04    Defendant is liable for fraud and Plaintiff is entitled to exemplary damages.

## IX.

## JURY DEMAND

9.1    Plaintiff requests a jury trial on the above-referenced claims.

WHEREFORE, PREMISES CONSIDERED, Claimant prays that Respondent be cited to appear and answer herein and that upon final arbitration hearing, Claimant have and recover the following relief against Respondent:

(1)    An award for actual damages, including but not limited to one year's severance and guaranteed incentive payments including $350,000 for 12 month severance, a guaranteed bonus for $50,000, and incentive bonuses totaling 150,000;

(2)    12 months COBRA coverage for $7,424;

(3)    30 Day notice period totaling $29,167;

(4)    Tax gross-up for Moving and Temporary Living totaling $30,000.

(5)    Exemplary damages in an amount to be determined by the trier of fact;

(6)    Pre-judgment and post-judgment interest at the maximum legal rate;

(7)    Attorney's fees;

(8)    Expert's fees, if applicable;

(9)     All costs of these proceedings including the costs incurred in connection with earlier arbitration proceedings; and

(10)    Such other and further relief to which Claimant may be justly entitled.


DATED: May 20, 2020.                    Respectfully submitted,

                                        **KILGORE & KILGORE, PLLC**

                                        By:  /s/ Nicholas A. O'Kelly
                                        NICHOLAS A. O'KELLY
                                        State Bar No. 15241235
                                        **KILGORE LAW CENTER**
                                        3109 Carlisle, Suite 200
                                        Dallas, TX  75204
                                        nao@kilgorelaw.com
                                        (214) 969-9099 - Telephone
                                        (214) 953-0133 - Fax

                                        **ATTORNEY FOR PLAINTIFF**
                                        **TERRENCE H. O'NEAL**

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made as of the 24th day of May, 2019 (the "Effective Date"), by and between **Ultravision Technologies, LLC**, a Delaware limited liability company (the "Company"), having its principal office located at 4542 McEwen Road, Dallas, Texas 75234 and Terrence "**Terry" Howard O'Neal**, residing at 29 On Chun Street, Suite 1657, Ma On Shan, Hong Kong (the "Employee") (each of the foregoing individually a "Party" and collectively the "Parties").

### RECITALS

**WHEREAS**, the Company desires to employ the Employee as the President and Chief Operating Officer of the Company under the terms and conditions set forth herein; and

**WHEREAS**, the Employee desires to be employed by the Company under such terms and conditions;

**NOW, THEREFORE**, in consideration of the representations, warranties and mutual covenants set forth herein, the sufficiency and receipt of which being acknowledged by the Parties, the Parties agree as follows:

1.    Employment. The Company shall employee the Employee on the terms and conditions set forth in this Agreement.

2.    Term.  The term of employment under this Agreement shall commence as of the Effective Date and shall continue in full force and effect for a period of three (3) years thereafter (the "Initial Employment Term"), unless this Agreement is terminated at an earlier date pursuant to the provisions of Section 6 of this Agreement.  The Employee's employment will be automatically renewed for additional successive one (1) year periods ("Renewal Terms") on the third and following anniversaries of the Effective Date, unless (i) the Employee or the Company, by written notice to the other Party no later than sixty (60) days prior to the expiration of an Employment Term (including the Initial Employment Term), elects not to renew this Agreement for the period following such Employment Term or (ii) this Agreement is terminated at an earlier date pursuant to the provisions of Section 6, hereof. The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term."

3.    Position and Duties.

    3.1.    During the Employment Term, the Employee shall serve as the President and Chief Operating Officer ("COO") of the Company, reporting to the Board of Managers of the Company ("Board of Managers"), and work collaboratively with the Chief Executive Officer ("CEO"), who also reports to the Board of Managers.  In such position, the Employee shall have such duties, authority and responsibility as shall be determined from time to time by the Board of Managers, which duties, authority and

responsibility are consistent with the Employee's position, including, without limitation, those set forth in **Schedule A** attached hereto.

3.2. The Employee shall, if requested, also serve as an officer or director of any subsidiary or Affiliate of the Company for no additional compensation.

3.3. Notwithstanding the foregoing, the Employee shall not have the authority to bind the Company in any transaction if inconsistent with, or contrary to, the contract and spending restrictions set forth in Schedule A.

3.4. Except as otherwise provided herein and except for illness, holidays, personal days, permitted vacation periods and permitted leaves of absence consistent with the regular practice or policies of the Company or as otherwise approved by the Board of Managers, the Employee agrees that during the term of his employment hereunder he shall devote his full business time, efforts, skill and abilities to the business of the Company in accordance with the lawful directions and orders of the Board of Managers consistent herewith and with the Employee's title, and will use his reasonable best efforts to promote the interests thereof, provided that the Employee may (i) take reasonable amounts of time to serve as a director or in some other capacity for other corporations or organizations. which, in the mutual opinion of the Employee and the Company, would benefit the Company, (ii) serve as a director or in some other capacity for other companies or business organizations or manage his personal investments if each such activity, and such activities in the aggregate, do not interfere with his duties under this Agreement and do not regularly involve a material amount of time, or (iii) engage in charitable, educational, religious, civic and similar types of activities, speaking engagements, attendance at seminars and similar activities, to the extent that such activities do not inhibit or prohibit the performance of the Employee's duties hereunder or inhibit or conflict with the business of the Company. Subject to the restrictions set forth in (ii) above, the Company acknowledges and accepts Employee's current outside activities and investments as set forth in Schedule C.

3.5. The principal place of the Employee's employment shall be the Company's office currently located at 4542 McEwen Road, Dallas, Dallas County, TX 75234; provided that, the Employee will be required to travel, including internationally, on Company business during the Employment Term.

4. Compensation; Benefits; Expenses.

4.1. Salary. In consideration of the services to be rendered by the Employee hereunder, including, without limitation, any services rendered by him as an officer or director of the Company or any Affiliates of the Company, the Company agrees to pay to the Employee, and the Employee agrees to accept as compensation, an annual salary of $350,000 (the "Base Salary") payable pursuant to the Company's normal payroll practices as from time-to-time in effect less any amounts owed by the Employee in

2

EXHIBIT A

accordance with Paragraphs 4.2 or 4.4 below.  The Employee's Base Salary shall be subject to all applicable legally or contractually required or voluntary withholding and other taxes.  The amount of the Employee's Base Salary may be adjusted as of the first day of each Renewal Term following the Initial Employment Term in an amount mutually agreed upon by the Company and the Employee based upon a performance evaluation performed by the Board of Managers and discussed in person with Employee, with such adjustment in Base Salary being made only if the Board of Managers determines in its sole discretion that such an adjustment is warranted.

4.2.    Incentive Bonus.  Employee will be entitled to an incentive bonus with a target amount of $250,000 if Employee meets or exceeds the annual performance objectives and operating metrics set forth on Schedule B (the "Annual Performance Objectives").    If Employee exceeds 120% of the Annual Performance Objectives, Employee will be entitled to an additional incentive bonus of a minimum of $50,000 or 120% of target incentive bonus.  Employee shall be guaranteed an incentive bonus of $50,000 for 2019 and $100,000 for 2020 (the "Guaranteed Incentive Bonuses").  All above-referenced incentive bonuses (each an "Incentive Bonus") will be paid on normal bonus payment dates following year-end.  Unless Employee has been terminated without Cause or has resigned for Good Reason within four months prior to the normal bonus payment date, Employee must be employed at time of payment to be eligible to receive the applicable Incentive Bonus.  If during the 4-month period prior to the normal bonus payment date Employee has been terminated without Cause or has resigned for Good Reason, Employee shall be entitled to a prorated amount of the applicable Incentive Bonus based on the proportion of the year Employee was employed.  If, during the first twenty-four (24) months after the Effective Date, Employee terminates his employment Without Good Reason as defined below or is terminated for Cause as defined below, Employee shall be obligated to repay any Guaranteed Incentive Bonuses unless Employee met the applicable Annual Performance Objectives for the preceding year (for example, if Employee terminates employment Without Good Reason in less than 24 months and has already been paid the $50,000 Guaranteed Incentive Bonus for 2019 but did not meet the Annual Performance Objectives for 2019 to earn the $250,000 Incentive Bonus, Employee would be obligated to return the $50,000).

4.3.    Phantom Unit Plan.  Employee will be entitled to participate in a deferred compensation plan (the "Phantom Unit Plan"), the terms and conditions of which are set forth in the attached **Schedule D**.

4.4.    Relocation Allowance.    Subject to a maximum aggregate payment of $58,000, the Company will directly pay actual costs for (a) transportation of Employee's personal effects from Hong Kong to Dallas, Texas; (b) costs associated with termination charges of Employee's current Hong Kong residential lease; and (c) personal transportation from Hong Kong to Dallas, Texas.    If there are tax ramifications to Employee from the foregoing payments, the Company will reimburse Employee for such

3

tax costs, subject to proof of such tax costs and the $58,000 aggregate maximum on payments. The Company will also pay up to $3,000 a month for three (3) months for temporary living in Dallas. Employee shall be obligate to repay all costs the Company pays pursuant to this section 4.3 if Employee is terminated for Cause as defined below or if he resigns Without Good Reason as defined below within eighteen (18) months of execution of the Effective Date.

4.5.   Benefits. During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans") on a basis that is no less favorable than is provided to other similarly situated executives of the Company, to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or cancel any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. At present, the Company and its Employee will not participate in any of the employee benefit plans of Active Media Services, Inc. dba Active International or its Affiliates (collectively "Active Media").

4.6.   Vacation. During the Employment Term, the Employee shall be entitled to twenty (20) business days of paid vacation per calendar year (prorated for partial years) in accordance with the Company's vacation policies, as in effect from time to time, on a basis that is no less favorable than is provided to other similarly situated executives of the Company. Vacation days must be used in the fiscal year they are granted, may not be carried over to a subsequent fiscal year unless approved by Board, and have no cash value.

4.7.   Reimbursement of Expenses.   Subject to and in accordance with the Company's policies and procedures, and upon presentation of itemized accounts and documentation, the Company shall reimburse the Employee for reasonable and necessary out-of-pocket expenses (other than commuting expenses) incurred by the Employee in performing the duties related to his employment hereunder. Such expenses shall include, but shall not be limited to, reasonable and necessary out-of-pocket expenses incurred by the Employee for travel (other than commuting expenses), accommodations, meals and entertainment.

5.   Office Facilities. The Company shall furnish the Employee with the assistance and the facilities necessary for the performance of his duties for the Company, including, but not limited to, office space and office equipment.

6.   Termination of Employment.

6.1.   Termination of Employment. The Employment Term and the Employee's employment hereunder may be terminated by either the Company or the Employee in accordance with the provisions of this Section 6. Upon termination of the Employee's

4

employment during the Employment Term, the Employee shall be entitled to the compensation and benefits described in this Section 6 and shall have no further rights to any compensation or any other benefits from the Company or any of its Affiliates.

6.2.   Notice of Termination.   Any termination or resignation of the Employee's employment by the Company or by the Employee, as applicable, under this Section 6 (other than termination of employment as a result of the Employee's death or the election by either Party not to renew the Employment Term pursuant to Section 2) shall be given by notice to the other Party hereto (i) indicating whether the termination is for or without Cause (as defined below) or the resignation is for or without Good Reason (as defined below), (ii) indicating the specific termination provision in this Agreement relied upon, and (iii) specifying a date of termination (the "Termination Date"), which shall be thirty (30) days following the date of notice (or such other date as mutually agreed upon by the Parties), other than with respect to a termination for Cause or a resignation for Good Reason.

6.3.   Accrued Rights.   Upon a termination of the Employee's employment for any reason, the Employee (or the Employee's estate) shall be entitled to receive the sum of the Employee's Base Salary through the Termination Date not theretofore paid (payable within 30 days of the Termination Date, or such earlier date as may be required by applicable law); reimbursement for any unreimbursed business expenses incurred through the Termination Date; accrued and unused vacation; and such employee benefits if any, as to which the Employee may be entitled under the Company's Employee Benefit Plans as of the Termination Date including, without limitation, continued health and medical (and, if applicable, dental and vision) coverage as required under Part 6 of Title I of the Employee Retirement Income Security Act of 1974, as amended ("COBRA Coverage") (collectively, the "Accrued Amounts").

6.4.   Termination by the Company without Cause or Resignation for Good Reason.   The Employment Term and the Employee's employment hereunder may be terminated by the Employee for Good Reason or by the Company without Cause. In the event of such termination, the Employee shall be entitled to receive the Accrued Amounts and, subject to the Employee's compliance with Sections 7, 8 and 9 of this Agreement and his execution of a release of claims in favor of the Company, its Affiliates and their respective officers and directors in a form provided by the Company (the "Release"), the Employee shall be entitled to receive (i) continued Base Salary for twelve (12) months ("Severance Payments") following the Termination Date ("Severance Period") payable in equal installments in accordance with the Company's normal payroll practices; (ii) COBRA Coverage until the end of the Severance Period or until Employee becomes eligible for another employer's group health plan, whichever occurs first; (iii) if the Annual Performance Objectives are met for the year in which termination occurs, the Incentive Bonus pro-rated for the number of days from the start of the year until termination; and (iv) any remaining amounts to be paid under the Phantom Unit Plan (in

5

respect of rights that have vested and been exercised under the Phantom Unit Plan) on the date or dates such payments are required pursuant to the Phantom Unit Plan; any unvested or exercised rights under the Phantom Unit Plan as of the Termination Date shall be forfeited. If the Employee commences employment with a subsequent employer during the Severance Period, the Severance Payments shall not be reduced by the amount of compensation the Employee receives during the Severance Period from such subsequent employer. Following the Employee's termination of employment by the Company without Cause or upon the Employee's resignation with Good Reason, except as set forth in this Section 6.4, the Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(a)     For purposes of this Agreement, "Cause" shall mean:

(i)     embezzlement, fraud or any other offense by the Employee involving misuse or misappropriation of money or other property of the Company;

(ii)     the Employee's commission of fraud, conviction of a felony (or guilty or *nolo contendere* plea by the Employee with respect thereto), or a crime that constitutes a misdemeanor involving moral turpitude if such misdemeanor materially impairs the Employee's ability to perform services for the Company or its Affiliates or results in material harm to the Company or its Affiliates;

(iii)     habitual drunkenness or habitual use of illegal substances that materially impairs Employee's ability to perform services for the Company or its Affiliates or results in material harm to the Company or its Affiliates;

(iv)     any gross misconduct or willful engagement in dishonesty that adversely affects the business or the reputation of the Company;

(v)     the material breach of any code of ethics or similar material policies of the Company or breach of a material obligation under this Agreement;

(vi)     the existence of any court order or settlement agreement signed and/or entered into by the Employee prohibiting the Employee's continued employment with the Company;

(vii)     the deliberate and continuous refusal to perform employment duties reasonably requested by the Company; or

(vii)     the Employee's execution of or entering into a written non-competition agreement, confidentiality agreement, proprietary information

6

agreement, trade secret agreement or any other similar agreement with any person (other than the Company and its Affiliates) that prevent(s) the Employee from working for, and/or performing his material duties for the Company.

(b)     The Company must provide Employee with written notice of the existence of the circumstances providing grounds for termination for Cause promptly after such grounds are reasonably fully known.  If the Company does not provide such notice to Employee within twenty (20) days after the applicable grounds for such Cause are reasonably fully known, then the Company will be deemed to have waived its right to terminate Employee for Cause with respect to such grounds.  For any event constituting Cause that can be cured, the Employee must be given at least twenty (20) days from the date on which notice is provided to cure the circumstances giving rise to Cause, provided such matter is capable of being cured.  If the Company provides termination notice and the Employee has not cured such circumstances within the twenty (20) day cure period, the Termination Date shall be the date on which the twenty (20) day cure period expires. For any event constituting Cause that cannot be cured, the Termination Date shall be the date of the termination notice.

(c)     For purposes of this Agreement, "Good Reason" shall mean the occurrence of any of the following, in each case during the Employment Term without the Employee's written consent:

(i)     a material reduction in the Employee's Base Salary other than a general reduction in Base Salary that affects all similarly situated executives in substantially the same proportions;

(ii)     a relocation of the Employee's principal place of employment by more than 100 miles; or

(iii)     a material, adverse change in the Employee's authority, duties or responsibilities (other than temporarily while the Employee is physically or mentally incapacitated or as required by applicable law).

(iv) if any member of the Board breaches the same provisions shown as "Cause" in Paragraph 6.4 (a) i, ii, iv, or v and such breach causes a material dilution in the value of the Company.

(d)     The Employee cannot terminate his employment for Good Reason unless he has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within twenty (20) days of the initial existence of such grounds and the Company has had at least twentyy (20) days from the date on which such notice is provided to cure such circumstances.  If the Employee does not terminate his employment for Good Reason within twenty (20) days after the first occurrence of the applicable grounds, then the Employee will be

7

deemed to have waived his right to terminate for Good Reason with respect to such grounds. If Employee provides termination notice and the Company has not cured within the twenty (20) day cure period, the Termination Date shall be the thirtieth (30th) day after the date of the termination notice.

6.5. <u>Termination by the Company for Cause; Resignation Without Good Reason</u>. If Employee's employment shall be terminated by the Company for Cause or upon Employee's resignation without Good Reason, the Employee shall only be entitled to receive the Accrued Amounts. Following the Employee's termination of employment by the Company for Cause or upon the Employee's resignation without Good Reason, except as set forth in this Section 6.5, the Employee shall have no further rights to any compensation or any other benefits under this Agreement. If Employee is terminated for Cause or resigns Without Good Reason, Employee shall be entitled only to the Accrued Amounts and Employee shall be deemed to have forfeited any payments still to be made to Employee with respect to participation in the Phantom Unit Plan, even if rights under that the Phantom Unit Plan were previously vested and exercised.

6.6. <u>Disability or Death</u>. The Employment Term and the Employee's employment hereunder shall terminate immediately upon the Employee's death. If the Employee becomes "Disabled" (as defined below) the Company may, at its option, terminate the Employee's employment hereunder. If the employment of the Employee is terminated pursuant to this Section 6.6, the Employee shall only be entitled to receive: (i) the Accrued Rights, and (ii) any remaining amounts to be paid under the Phantom Unit Plan (in respect of rights that have vested and been exercised under the Phantom Unit Plan) on the date or dates such payments are required pursuant to the Phantom Unit Plan; any unvested or exercised rights under the Phantom Unit Plan as of the Termination Date shall be forfeited. Following the termination of Employee's employment by reason of the Employee's Disability or death, except as set forth in this Section 6.6, the Employee shall have no further rights to any compensation or any other benefits under this Agreement.

For purposes of this Agreement, Disability shall mean the Employee's inability, due to physical or mental incapacity, to substantially perform his duties and responsibilities under this Agreement for one hundred eighty (180) days out of any three hundred sixty-five (365) day period or one hundred twenty (120) consecutive days or as otherwise defined in any disability insurance policy the Company determines in its sole discretion to obtain, in each case, in a manner consistent with applicable state and federal law. Any question as to the existence of the Employee's Disability as to which the Employee and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Employee and the Company. If the Employee and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to

the Company and the Employee shall be final and conclusive for all purposes of this Agreement.

6.7.   Change of Control.   For purposes of this Agreement, "Change of Control" shall mean a sale of substantially all of the assets of the Company or a capital transaction with one or more third parties unaffiliated with the members of the Company as of the Effective Date (the "Current Members") that results in the Current Members and/or their Affiliates no longer collectively owning 50% of the voting equity interests in the Company.   Upon a Change of Control, Employee shall become fully vested in the Phantom Unit Plan and paid all amounts he is owed under the Phantom Unit Plan as and when the Current Members receive proceeds in respect of their equity as part of such Change of Control and *pari passu* with the amounts the Current Members receive (*e.g.*, when the Current Members receive the first 20% of the proceeds for their interests, Employee will receive the first 20% of his entitlement under the Phantom Unit Plan). Any amounts still to be paid to Employee with respect to rights under the Phantom Until Plan that were vested and exercised prior to the Change of Control, will be paid to Employee as and when the Current Members receive proceeds in respect of their equity as part of such Change of Control and *pari passu* with the amounts the Current Members receive, even if that results in Employee receiving payments after he would have received such payments absent the Change of Control.

6.8.   Section 409A.

(a)   This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Employee on account of non-compliance with Section 409A.

(b)   Notwithstanding any other provision of this Agreement, if any payment or benefit provided to the Employee in connection with his termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and the Employee is determined to be a "specified employee"

9

as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of the Termination Date (the "Specified Employee Payment Date"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date shall be paid to the Employee in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

6.9.    Cooperation. The Parties agree that certain matters in which the Employee will be involved during the Employment Term may necessitate the Employee's cooperation in the future.   Accordingly, following the termination of the Employee's employment for any reason, to the extent reasonably requested by the Board, the Employee shall cooperate with the Company in connection with matters arising out of the Employee's service to the Company; provided that, the Company shall make reasonable efforts to minimize disruption of the Employee's other activities. The Company shall reimburse the Employee for reasonable expenses incurred in connection with such cooperation.

6.10.    Exit Obligations.   Upon termination of Employee's employment at any time or for any reason, the Employee shall, within seven (7) business days of the Termination Date: (i) provide or return to the Company any and all Company property, including without limitation keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, PDAs, pagers, fax machines, equipment, speakers, webcams, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, negatives and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information (as defined below) or Work Product (as defined below), that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company or its Affiliates that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations and media in the Employee's possession or control, and provide written certification of such deletion and destruction if requested by the Company.

7.    Confidential Information.   The Employee understands and acknowledges that during the Employment Term, he will have access to and learn about Confidential Information, as defined below.  The Employee agrees that the Confidential Information constitutes protectable business interests of the Company and its Affiliates.

7.1.    Confidential Information Defined.

(a)    For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, whether or not marked "Confidential", whether such information was developed by Company or its Affiliates, Employee or by third parties, directly or indirectly related to the Company, its Affiliates or its Business including, without limitation, business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, work-in-process, databases, manuals, records, articles, systems, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, pricing information, credit information, design information, specifications, payroll information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, prototypes, product plans, designs, styles, models, ideas, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes and result, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company or its Affiliates or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company in confidence. The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

(b)    The Employee understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee; provided that, such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf. The Employee further understands and acknowledges that the Company and its Affiliates have invested, and continues to invest, substantial time, money and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of digital display and LED Lighting. The Employee understands and acknowledges that as a result of these efforts, the Company and its Affiliates have created, and continue to use and create Confidential Information. This Confidential Information provides the Company and its Affiliates with a competitive advantage over others in the marketplace.

11

7.2.    Disclosure and Use Restrictions.

(a)     The Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company and its Affiliates not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and its Affiliates, in any event, not to anyone outside of the direct employ of the Company and its Affiliates except as required in the performance of the Employee's authorized employment duties to the Company or with the prior consent of Board of Managers or the Chairman acting on behalf of the Company and its Affiliates in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent)); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Company and its Affiliates except as required in the performance of the Employee's authorized employment duties to the Company or with the prior consent of Board of Managers or Chief Executive Officer acting on behalf of the Company or its Affiliates in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(b)     Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. The Employee shall promptly provide written notice of any such order to the Board of Managers and Chief Executive Officer.

(c)     The Employee understands and acknowledges that his obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information (whether before or after he begins employment by the Company) and shall continue during and after his employment by the Company until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

**8.**    Inventions and Work Product.

**8.1.**    The Employee agrees that all Inventions and Work Product initiated, made or conceived by the Employee, during the Employment Term, whether alone or in conjunction with others, that relate to the business of the Company shall be owned

12

exclusively by the Company, and the Employee hereby assigns to the Company all right, title and interest he may have or acquire in all such Inventions and Work Product. The term "Inventions and Work Product" includes, by way of example but without limitation, trade secrets or other Proprietary Information, patents and patent applications, trademarks and trademark registrations and applications, service marks and service mark registrations and applications, trade names, copyrights and copyright registrations and applications. The Employee shall (i) promptly notify and make full disclosure to the Company of any Inventions and Work Product, and execute and deliver any documents requested by the Company to evidence or better assure title to Inventions and Work Product in the Company, as so requested, (ii) renounce any and all claims, including but not limited to claims of ownership and royalty, with respect to all Inventions and Work Product, (iii) assist the Company in obtaining, maintaining and enforcing for itself at its own expense United States and foreign patents, copyrights, trade secret protection or other protection of or rights in any and all Inventions and Work Product, and (iv) promptly execute, whether during the Employment Term or thereafter, all applications or other endorsements necessary or appropriate to maintain patents and other rights for, or to protect the title of, the Company, including but not limited to assignments of such patents and other rights. The Employee acknowledges that all Inventions and Work Product shall be deemed "works made for hire" under the Copyright Act of 1976, as amended, 17 U.S.C. § 101. The Employee also agrees to waive all claims to moral and/or equitable rights in any Inventions and Work Product.

8.2.    The Employee shall transfer and assign, and does hereby transfer and assign, to the Employer all of his rights, title and interest in and to all Inventions and Work Product covered by this Section 8. The Employee agrees to cooperate fully with the Company, at the cost of the Company both during and after the Employee's employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents and other intellectual property rights (both in the United States and foreign countries) relating to Inventions and Work Product. The Employee agrees that he will sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths, formal assignments, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Inventions and Work Product. The Employee further agrees that if the Company is unable, after reasonable effort, to secure the Employee's signature on any such papers, any executive officer of the Company shall be entitled to execute any such papers as the Employee's agent and attorney-in-fact, and the Employee hereby irrevocably designates and appoints each executive officer of the Company as the Employee's agent and attorney-in-fact to execute any such papers on the Employee's behalf, and to take any and all actions the Company may deem necessary or desirable, in order to protect its rights and interests in any Inventions and Work Product, under the conditions described in this sentence.

8.3. The Employee hereby represents that he is not bound by the terms of any agreement with any previous employer or other person to refrain from performing his duties as set forth hereunder. The Employee further represents that his performance of all the terms set forth in this Agreement, and of all of the Employee's duties as an employee of the Company, does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by the Employee in confidence or in trust prior to the Employee's employment with the Company as contemplated by this Agreement, and the Employee will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

9. <u>Restrictive Covenants</u>.

9.1. <u>Non-Competition</u>.

(a) Because of the Company's and its Affiliates' legitimate business interest as described herein and the good and valuable consideration offered to the Employee (including but not limited to the Confidential Information provided to Employee), during the Employment Term and for the a period of twenty four (24) months after the last day of the Employee's employment with the Company ("<u>Restricted Period</u>"), for any reason or no reason and whether employment is terminated at the option of the Employee or the Company or its Affiliates, the Employee agrees and covenants not to engage directly or indirectly in Prohibited Activity. For purposes of this Section 9, "Prohibited Activity" is activity in which the Employee contributes his knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to an entity engaged in the same or similar business as the Company or its Affiliates, including, without limitation, those engaged in a business that designs, builds, installs, develops, distributes, re-sells and services electronic signs, electronic billboards, LED digital displays, display panels, or LED light fixtures used to illuminate billboards. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information or Confidential Information. Nothing herein shall prohibit the Employee from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation or entity, provided that such ownership represents a passive investment and that the Employee is not a controlling person of, or a member of a group that controls, such corporation or entity.

(b) In the event of any breach of the provisions of this Section 9.1 hereof by Employee, the relevant restricted period shall be extended by a period equal to the length of time from the commencement of such violation until such time as the violation shall be deemed cured by the Employer in writing.

9.2. <u>Non-Solicitation</u>.

14

(a)     The Employee agrees that while the Employee is employed by the Company and, thereafter, during the Restricted Period, Employee will not, without the prior written consent of the Company, directly or indirectly (a) solicit, attempt to solicit or cause to be solicited, directly or indirectly, any past or current employee or consultant of the Company or of any of its Affiliates, or (b) directly or indirectly request, cause, or encourage any employee or consultant of the Company or of any of its Affiliates to terminate their engagement or consulting relationship with the Company or of any of its Affiliates.

(b)     The Employee agrees that while the Employee is employed by the Company and, thereafter, during the Restricted Period, the Employee will not, without the prior written consent of the Company, (a) solicit, attempt to solicit or cause to be solicited, directly or indirectly, any actual, past, or prospective customer of the Company or of any of its Affiliates ("Customer"), or (b) directly or indirectly request, cause, or encourage any actual, past, or prospective customer of the Company or of any of its Affiliates, to modify, reduce, or terminate their actual or prospective customer relationships with the Company or any of its Affiliates, or to otherwise do business with any business engaged in offering services or products similar to, or competing with, or reasonably competing with, the services or products offered by the Company and any of its Affiliates.

(c)     If Employee breaches this Section 9.2, the relevant restricted period shall be extended by a period equal to the length of time from the commencement of such violation until such time as the violation shall be deemed cured by the Employer in writing.

9.3.    Non-Defamation.    The Employee agrees that, during the term of his employment and thereafter, Executive shall not disparage or criticize the Company, its Affiliates, or any of their respective principals, directors, officers, employees or independent contractors including without limitation taking any actions that are or could be harmful to the Company's goodwill with its clients, vendors, employees, independent contractors, the media, or the public.    The Company similarly agrees that, during Employee's tenure and thereafter, the Company shall not disparage or criticize Employee.

9.4.    Blue Pencil Rule.    The Employee and the Company desire that the provisions of this Section 9 be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.    The Parties agree that Employee is a key Employee of the Company.    If a court of competent jurisdiction, however, determines that any restrictions imposed on the Employee in this Section 9 are unreasonable or unenforceable because of duration, geographic area or otherwise, the Employee and Company agree and intend that the court shall enforce this Section 9 to the maximum extent the court deems reasonable and that the court shall have the right to strike or change any provisions of this Section 9 and substitute therefore different provisions to effect the intent of this Section 9 to the maximum extent possible.

9.5. Notification to the Company of Subsequent Employment. Promptly after commencing employment with any person, firm, corporation or other entity during or after the Employment Term and during the Restricted Period the Employee shall notify the Company of the identity of such new employer and provide a description of his title and job duties at such new employer.

10. Injunctive Relief. The Employee hereby acknowledges that he is fully cognizant of the restrictions imposed upon him pursuant to the terms of this Agreement. Employee understands and agrees that, in view of the nature of the Employer's business, the restrictions contained in this Agreement, including without limitation the restrictions set forth in Sections 7, 8 and 9, are reasonable and necessary to protect the legitimate business interests of the Employer and that enforcement of the foregoing restrictions will not impose a hardship or impair Employee's ability to earn a livelihood. Employee recognizes that any breach of this Agreement will cause irreparable damage to Employer and that in the event of such breach, Employer shall have, in addition to any and all remedies at law and the right to recover damages, the right to an injunction, specific performance or other equitable relief to prevent the violation of Employee's obligations hereunder in a court of competent jurisdiction in Dallas, Texas. Employee agrees to waive any requirements for the securing or posting of any bond in connection with such a remedy. The prevailing party agrees to reimburse the other party for any and all expenses incurred by the prevailing party in any action to enforce the provisions of this Agreement, which expenses shall include, but not be limited to, attorneys' fees, court costs and investigation costs. In addition, the Company (or Affiliate or assignee as the case may be) shall be entitled to an accounting and payment over of all sums which Employee or any other party shall receive as a result of any violations of this Agreement, including, without limitation all compensation, profits, monies, accruals, increments and other benefits derived or received by the Employee as the result of any transaction constituting a breach of any such provision.

11. Representations and Warranties. The Parties represent and warrant that each is fully authorized and empowered to enter into this Agreement and that the performance of its or his obligations, as the case may be, under this Agreement will not violate any agreement between any such Party and any other person. The Company represents and warrants that this Agreement has been duly authorized by all necessary corporate action and is valid, binding and enforceable in accordance with its terms.

12. Miscellaneous

12.1. Governing Law: Jurisdiction and Venue. Except as provided in Section 13.2, below, this Agreement, for all purposes, shall be construed in accordance with the laws of the State of Texas without regard to conflicts of law principles that would result in the application of the laws of a State other than Texas and its arbitration law.

16

12.2. <u>Arbitration.</u> Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof shall be determined by binding arbitration in Dallas, Texas before a panel of three (3) arbitrators. In addition to all other matters, the arbitrator shall have exclusive authority to determine any and all issues and matters relating to the scope of the arbitration, the arbitrability of any claim or dispute, the validity of the agreement to arbitrate, and the arbitrator's jurisdiction. The arbitration and the selection of the arbitrator shall be administered by the American Arbitration Association (AAA). The arbitrator shall have authority to hold hearings at any location or in any jurisdiction in aid of obtaining information and testimony from third-parties. Judgment on the Award or any interim award may be entered in any court having jurisdiction. In any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. If the arbitrator determines that a party prevailed on some, but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. Each party shall pick an arbitrator from the AAA roster of neutrals and the two arbitrators shall pick the third arbitrator. Each arbitrator selected shall be a former judge or an attorney with experience as a partner of a major law firm and have at least ten (10) years' experience with business matters, business relationships and related financial matters. This clause shall not preclude parties from seeking provisional remedies, as provided in Section 10, above, from a court of competent jurisdiction as may be necessary to preserve the status quo and in aid of arbitration. This arbitration provision and obligation shall be governed and interpreted solely in accordance with the Federal Arbitration Act, 9 U.S.C. §§1 - 16.

12.3. <u>Entire Agreement</u>. Except specifically referenced or provided herein, this Agreement and all attachments hereto contains all of the understandings and representations between the Employee and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

12.4. <u>Modification and Waiver.</u> No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and by the Company. No waiver by either Party of any breach by the other Party of any condition or provision of this Agreement to be performed by the other Party shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either Party in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege

17

12.5.  <u>Notices</u>.  All notices and other communications provided for herein shall be dated and in writing and shall be deemed to have been duly given (a) on the date of delivery, if delivered personally, by facsimile, receipt confirmed or by electronic transmission, (b) on the second following business day, if delivered by a recognized overnight courier service, or (c) seven days after mailing, if sent by registered or certified mail, return receipt requested, postage prepaid, in each case, to the party to whom it is directed at the following address (or at such other address as any party hereto shall hereafter specify by notice in writing to the other parties hereto): If intended for (a) the Company, c/o William Hall, 4542 McEwen Road, Dallas, Texas 75234, with a copy to Daniel Winikka, Esq., Loewinsohn Flegle Deary Simon LLP, 12377 Merit Drive, Suite 900, Dallas, Texas 75251. If intended for the Employee, to the address first stated above with a copy to 6101 Long Prairie Road, Suite 744-54, Flower Mound Texas, 75028 and via email at terryhoneal@yahoo.com.

12.6.  <u>Severability</u>.  Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.  The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law.  The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.  In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been set forth herein.

12.7.  <u>Captions</u>.  Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

12.8.  <u>Successors and Assigns</u>.  This Agreement is personal to the Employee and shall not be assigned by the Employee.  Any purported assignment by the Employee shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any Affiliate or third party, including in connection with any merger, sale of assets, sale of stock, or any other form of transaction that pertains to all or

part of its business, and Employee hereby consents to any such assignment. Each Affiliate is an express third-party beneficiary of this Agreement.

12.9. <u>Survival</u>. Sections 7, 8, 9, 10, 11 and 12 shall survive termination or expiration of this Agreement and all other respective rights and obligations of the Parties shall survive such expiration or other termination to the extent necessary to carry out the intentions of the Parties under this Agreement.

12.10. <u>Acknowledgment of Full Understanding</u>. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT HE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF HIS CHOICE BEFORE SIGNING THIS AGREEMENT.

12.11. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may also be executed via facsimile, which facsimile shall be deemed an original. Scanned versions of signatures shall have the same force and effect as original signatures.

13.  <u>Certain Definitions</u>

(a)  As used herein, "<u>Affiliate</u>" shall refer to any Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Company. As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. For purposes of clarify, Active Media shall be deemed an Affiliate of the Company as well as Aral Holdings, LLC.

(b)  As used herein, the term "<u>Person</u>" shall be construed broadly and shall include, without limitation, an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**COMPANY**:

**ULTRAVISION TECHNOLOGIES, LLC**

19

By: _____

Name: William Hall

Its: CEO

**EMPLOYEE:**

By: _____

Terry O'Neal

## **SCHEDULE A**

### **Duties and Restrictions**

Scale Ultravision Technologies, LLC ("Ultravison" or the "Company") into a substantial player in the LED displays and LED lighting industries and work with CEO and Board of Directors to effectuate an increased valuation and eventual successful exit.

- Quickly integrate and learn the technical, sales and marketing strategies of the Company under the mentorship of the CEO and direct guidance of the Board of Directors.
- Focus on order fulfillment and customer service within prescribed operating margins.
- Focus on sales and marketing strategies to ensure a robust customer and order pipeline.
- Manage to budgeted EBITDA, operating cash and valuation expectations.
- Manage and coordinate all activities associated with manufacturing, manufacturing engineering, supply chain, and materials management of Ultravision's broadly patented LED displays and lighting technology.
- Manage operations, including the performance of all department functions: Field Operations, Materials Management, Order Services, Customer Service, Warranty Service, Maintenance Service and Installation Project Management.

Primary Objective: Scale the Company into a substantial player in the LED displays and LED lighting industries and work with CEO and Board of Directors to effectuate an increased valuation and eventual successful exit.

Duties:

- Quickly integrate and learn the technical, sales and marketing strategies of the Company under the mentorship of the CEO and direct guidance of the Board of Directors.

- Focus on order fulfillment and customer service within prescribed operating margins.

- Focus on sales and marketing strategies to ensure a robust customer and order pipeline.

- Manage to budgeted EBITDA, operating cash and valuation expectations.

- Manage and coordinate all activities associated with manufacturing, manufacturing engineering, supply chain, and materials management of the Company's broadly patented LED displays and lighting technology.

- Manage operations, including the performance of all department functions: Field Operations, Materials Management, Order Services, Customer Service, Warranty Service, Maintenance Service and Installation Project Management. And as part of management of operations:

    ○ Support achievement of key metrics, including quality, safety, productivity, and cost through process change and improvement.

21

- o Define and develop process opportunities to reduce costs and to maximize productivity. Create link between operational requirements and material supplier capabilities.
- o Support all facets of operations with emphasis on improving productivity through higher efficiencies, reduced scrap, and optimized labor.
- o Define key critical parameters and develop plans to control and improve. Create recommendations to the Board of Managers.

- Such other duties and responsibilities as may be assigned by Board of Managers.

Restrictions for expenditures not in the approved budget and does not preclude customer orders in the normal course of business:

All contracts involving expenditures that are reasonably anticipated to exceed $50,000 must be signed by a member of the Board of Managers, and Employee shall not have authority to execute such contracts on behalf of the Company without the express, prior written consent of a member of the Board of Managers.

Employee shall have authority to incur expenditures provided same are expressly pre-approved by the Board in a budget or in accordance with pre-approved exceptions expressly approved by the Board. Expenditures in an aggregate value equal to or under $50,000 may be made by Employee with copies of all such expenditures to be promptly given to a member of the Board of Managers, Chief Executive Officer and Chief Financial Officer of the Company. All expenses in excess of $50,000 must be approved by the Board of Managers.

22

## SCHEDULE B

**Annual Performance Objectives**

### SCHEDULE C

### For Boards/Equity positions

1) Alpine Technologies - 100% equity owned by Employee. This is an agency company selling LED dynamic lighting fixtures for architecture and concert performances and energy management products only in Asia-Pacific.

2) Raffles LLC - 100% equity owned by Employee. This is only for consultancy and board services.

3) FlexVPC - Blockchain solutions. The Employee is a Board Advisor and has a 1% equity position and receives related fees and expenses.

4) GrowthPhases LLC - Employee has a 10% equity position. This is an alliance company where Employee is engaged in acquisitions for Private Equity. Employee is not and will not be engaged in business area of Company.

24

## SCHEDULE D

### Phantom Unit Plan

Employee shall be entitled to participate in the creation of Company operational value through a "Phantom Unit Right" as described below. Capitalized terms not otherwise defined below have the meanings given to such terms in the Employment Agreement. Employee's rights in respect of the Phantom Unit Right are subject to all terms of the Employment Agreement, including, but not limited to, forfeiture under certain circumstances, dispute resolution provisions, and governing law.

Phantom Unit Right. As of the Effective Date, Employee will be granted a 3% participation Phantom Unit Right that, upon exercise in whole and subject to vesting and payment terms set forth herein, would entitle Employee to a total amount equal to 3% of the Company Operational Value as defined below. The Phantom Unit Right is subject to dilution if the member interests in the Company as of the Effective Date are diluted after the Effective Date as a result of any capital transaction. For instance, if there is an equity infusion that results in the member interests as of the Effective Date being diluted 20%, then the 3% participation right similarly would be diluted and Employee would thereafter be entitled (upon exercise and vesting of the Phantom Unit Right) to an amount equal to 2.4% (3% diluted by 20%) of the Company Operational Value.

Term and Exercise Rights. The Phantom Unit Right can be exercised at any time in whole or in part provided that Employee must exercise a minimum of 10% of the Phantom Unit Right on each partial exercise date. Once the Phantom Unit Right is exercised in whole or in part, the part exercised is fixed (and paid out subject to vesting and the payment schedule below) and only the unexercised portion of the Phantom Unit Right is subject to Company Operational Value appreciation/depreciation in future periods. There shall be no cost to Employee to exercise the Phantom Unit Right. Any portion of the Phantom Unit Right not exercised within ten (10) years after the Effective Date will be forfeited.

Vesting and Payout. The Phantom Unit Right is subject to vesting requirements before exercise and payout as follows:

- Vesting: To vest under the following schedule, Employee must be employed by the Company as of the date of the vesting event.

    - Change of Control Event: Full vesting.

    - Other:

        - 25% to vest at the end of the 12th month after the Effective Date

        - An additional 25% to vest at the end of the 24th month after the Effective Date

25

- An additional 25% to vest at the end of the 36th month after the Effective Date

- Remaining 25% to vest at the end of the 48th month after the Effective Date.

- Payout:

    o Non-Change of Control Event: Vested amount at time of exercise to be paid in three (3) equal payments. First payment to be made within six (6) months after exercise, second payment to be made on or before twelve (12) months following the first payment, and third payment to be made on or before twelve (12) months after the second payment. Interest to accrue and be paid on vested amount after the first payment at a per annum rate equal to the mid-term applicable federal rate.

    o Change of Control Event: Payments will be made to Employee as and when the Current Members receive proceeds in respect of their equity as set forth in section 6.7 of the Employment Agreement.

Company Operational Value. Unless there has been a capital infusion or Change of Control (as defined below), Company Operational Value will be annual EBITDA from operations (annual EBITDA backing out and excluding any effects of any intellectual property litigation proceedings) times a multiple of seven (7). Company Operational Value will be determined at the end of each calendar year. If there has been a capital transaction resulting in the issuance of equity in the Company exceeding 10% during the calendar year, the Company Operational Value will be the greater of (i) the annual EBITDA from operations times the multiple of seven (7) as noted above, and (ii) the implied equity value of the Company from the equity transaction. Notwithstanding the foregoing, if there is a Change of Control, the Company Operational Value will be deemed to be the implied equity value of the Company from the Change in Control transaction.

26

Begin forwarded message:

**From:** "Gary M. Steinbeck" <Gary.Steinbeck@activeinternational.com>
**Date:** November 1, 2019 at 10:34:38 AM EDT
**To:** "Terry H. O'Neal" <terryhoneal@yahoo.com>
**Cc:** Alan Elkin <Alan.Elkin@activeinternational.com>, Jay Santamaria
<Jay.Santamaria@activeinternational.com>
**Subject: Severance**


Dear Terry:

On behalf of the Board of Managers of Ultravision Technologies, LLC ("UVT"), I am writing to provide you with an overview of the Board's position regarding the status and interpretation of the severance provision of your employment agreement with UVT.

**The Board's Findings**

On September 12, 2019, you were notified that UVT had run out of cash and was changing the focus of its operations to maximize the value of its intellectual property and discontinuing the sale and manufacture of LED products. You and all employees were separated from the UVT as of September 15, 2019 with notification to that effect on September 13, 2019.

In this regard, the Board agrees that you did not receive 30 days' notice as prescribed by your employment agreement. Under the employment agreement this would amount to an additional 30 days' compensation being added to the 12 months' severance to which you are entitled.
The Board believes that the manner of payment of severance is clearly prescribed by the Agreement and that this severance will be paid by UVT's at its regular payroll intervals.

The Board also finds that COBRA payments/reimbursements are to be handled in the same manner.  Because UVT is not able to make your Cobra payments directly to ADP Total Source, UVT will provide an additional monthly payment to you of 125% of the Cobra premium so that on a net tax basis you should receive a payment which approximates the Cobra premium.

With respect to the guaranteed incentive that the agreement stipulates, it is the Board's interpretation that this is a minimum guarantee of a stated, performance-based incentive plan and payments under the plan are subject to the plan guidelines.  In this instance, the Board finds that these payments should be prorated for the term of your service as a regular full-time employee of UVT.  That service commenced on May 24, 2019 and terminated on October 25, 2019 yielding 154 days or $21,095.89 due on the first-year guarantee of $50,000.  For purpose of this calculation, the period on which you provided consulting services to UVT via your company Alpine Technologies has been considered as additional service time.

The employment agreement with UVT is clear on relocation and living expenses, which the Board interprets to include meals. Under the agreement, you are entitled to a maximum of $58,000 in relocation of household goods and related costs, including any statutory taxes thereon, and three months of temporary living at $3,000 per month.  It is the Board's understanding that such amounts have been paid, although should any amounts remain open, please provide an accounting and an adjustment will be made if appropriate.

**Discussion and Interpretation by the Board**

As you are aware, UVT currently has limited financial resources. While the Board will honor the agreement as stipulated above, it cannot do so until cash is once again in house.

While it is expected that the existing Cobra plan will continue to be provided by ADP Total Source, the Board will authorize equivalent payments to be included in severance payments for another medical plan should you determine to obtain coverage from another provider.

The Board takes the view that the six weeks that you were paid as a consultant to UVT at $10,000 per week is not an offset to be taken against the severance amounts otherwise due to you.

An analysis of the severance due to you is attached.

The Board will process severance payments to you as part of UVT's regular payroll processing when UVT has the financial ability to fund such a payroll.

The Board will calculate interest on any gaps in payments and add it to the final reconciliation of the severance payments when your final payment is calculated.  The Board will use LIBOR plus 1.0% as an annualized interest rate for this calculation.

**Summary**

I hope that our position is now clarified and encourage you to continue to engage in this dialogue and use this interpretive document as our assurances that what is owed to you by UVT will be paid when the company is once again solvent.  You know the Board is working towards that end.  There are, however, no guarantees that UVT will not be forced into a Chapter 7 or Chapter 11 filing by its many creditors.

If you still believe there is an issue that is subject to arbitration under the terms of your Agreement, please let me know, or have your attorney contact me so I can arrange for counsel for UVT.  Please do not contact Dayna Frank, as she has no legal standing or authority from the Board to represent UVT at this time. Thank you very much and do not hesitate to reach out with any questions, or to continue our dialogue.


Regards,

Gary M. Steinbeck
Chief Financial Officer on Behalf of Ultravision Technologies, LLC

EXHIBIT C



**KILGORE LAW**

**Nicholas A. O'Kelly**
nao@kilgorelaw.com
214-379-0827 direct
214-379-0848 fax

September 13, 2019

*Via Email: Alan.Elkin@activeinternational.com*
Alan Elkin, CEO
Active International, Inc.
One Blue Hill Plaza
Pearl River, NY 10965

*Via Email: bhall@uvintmail.com*
William Hall, CEO
Ultravision Technology, LLC
4542 McEwen Street
Farmers Branch, Texas 75244

      **Re:**    **Terry O'Neal/Ultravision International LLC**

Gentlemen:

     I have been retained by Mr. Terry O'Neal to advise him in connection with his employment agreement with your company, Ultravision Technologies, LLC. ("Ultravision") dated May 24, 2019.

     I am aware of the ongoing discussions between Mr. O'Neal, Ultravision, and Active International ("Active") and do not wish to disturb them. At this point, my role is as consultant rather than legal representative. The purpose of this letter is to introduce myself, memorialize the current status of the discussions, and outline the terms of Mr. O'Neal's future role with Ultravision under the current circumstances.

     On September 11, 2019, Mr. O'Neal was informed in a conference call with Mr. Mel Lazar and Mr. Gary Steinbeck that Ultravision is terminating Mr. O'Neal's employment effective September 13, 2019. In this conference call, it was confirmed that Mr. O'Neal is not being terminated "for cause" as the term is defined in his Employment Agreement with Ultravision.

     In that same conference call, Mr. Lazar, speaking on behalf of Ultravision and Active International, acknowledged the Company's contractual obligations as defined under Mr. O'Neal's Employment Agreement regarding Mr. O'Neal's severance, back pay, and unreimbursed expenses. Mr. Lazar also confirmed that following his separation from Ultravision, Mr. O'Neal will not be bound by the "Non-Compete" clause in Paragraph 9 of the Agreement.

Mr. O'Neal also reports that during the same conference call, Mr. Lazar made reference to the mismanagement of certain funds within Ultravision by certain principals.   This mismanagement of funds took place before Mr. O'Neal joined the company and during the time which Mr. O'Neal's employment agreement was being negotiated.   This information was not disclosed during the contract negotiations with Mr. O'Neal.   Without any further elaboration, these facts constitute "good reason" (as this term is defined under the Employment Agreement) for Mr. O'Neal to resign from Ultravision without risk of forfeiture of severance.

Finally, Mr. O'Neal has been advised that he will not be paid for the period ending September 13, 2019.   He has also been informed that he will not receive his reimbursable business expenses which are in excess of $29,005.   These events allow Mr. O'Neal to resign his employment for good reason under the Agreement.

This letter will serve as written notice by Mr. O'Neal of his intent to terminate his employment for good reason, and is being made within 20 days of his receiving initial knowledge of the existence of such breach pursuant to paragraphs 6.4 (b), (c) and (d) of the Employment Agreement.

Notwithstanding the above, Mr. O'Neal has conveyed to Mr. Lazar and Mr. Steinbeck his desire to amicably separate from Ultravision on good terms and in support of its parent company, Active International, in its efforts to wind down the business and act as trusted agent and work on behalf of the equity and debt holders of the company.

Mr. O'Neal has directed me to propose the following terms:

(A) Mr. O'Neal will serve as an Active International Consultant on a month-to-month basis up until December 31, 2019, to assist in the orderly wind-down of Ultravision's business.   During this time, Mr. O'Neal will be paid his agreed-upon salary of $350,000 with continued health insurance whether under COBRA or paid for separately by Active;

(B) Severance - Upon conclusion of these consulting services, Active International will pay Mr. O'Neal $350,000 in severance, which will be paid in one lump sum in lieu of regular pay periods, as business may discontinue, and/or Ultravision may file bankruptcy;

(C) Guaranteed 2019 Bonus – Upon conclusion of these consulting services, Active International will pay Mr. O'Neal a $50,000 bonus will be paid in one lump sum in lieu of in regular pay periods as business may discontinue and/or Ultravision may file bankruptcy;

(D) Unpaid vacation days be paid upon signing of this agreement;

(E) All business expenses be reimbursed - past, current, and until December 31, 2019;

(F) All temporary living expenses be reimbursed;

(G) All moving expenses up to $58,000 be paid directly AND to include any lease cancellation charges for his Dallas apartment not foreseen in the original agreement;

(H) 12 months of insurance coverage whether under COBRA or paid for separately; and

(I) Active International to pay $10,000 for legal fees in conjunction with this employment agreement.

These terms will be set forth in a separate consulting agreement between Mr. O'Neal and Active International. Considering the recent events and the potential shutdown of Ultravision, Mr. O'Neal must respectfully insist that Active International provide a written guarantee of Ultravision's obligations under Terms (A) through (H) above. These are essentially the same terms to which the parties agreed, principally Active International and Mr. O'Neal, under the signed Employment Agreement. It was Active International who sought out Mr. O'Neal as early as June, 2018, and negotiated his employment agreement's terms and conditions on behalf of Ultravision. Mr. O'Neal does not seek any additional compensation than what was previously negotiated, despite obvious disruption to his career and probable damage to his reputation.

Mr. O'Neal would like to reach an agreement as soon as possible and begin acting in a consultant capacity while searching for new employment unencumbered by the restrictive covenants set forth in the current agreement. Mr. O'Neal would also request that Mr. Mel Lazar and Mr. Alan Elkin provide a positive professional reference for potential future employers. Mr. Lazar and Mr. Elkin shall state that Mr. O'Neal's separation from the company was on good terms and that his separation from the company was due solely to business discontinuation that was unforeseen by Mr. O'Neal. Mr. O'Neal would also request a separate letter stating that he is not bound by any Non-Competition restrictive covenant and is free is seek employment with any company without restriction.

If these terms are acceptable, then please indicate your acknowledgment and agreement in the space provided below and return it to my attention.

Sincerely,

Nicholas A. O'Kelly.

[Agreement and Acknowledgements to follow on Page 4]

EXHIBIT C

Acknowledged and Agreed, this __day of September, 2019


_____
Alan Elkin, CEO, Active International
Authorized Representative



Acknowledged and Agreed, this___ day of September, 2019



_____
William Hall, CEO, Ultravision
Authorized Representative



CC:    Mr. Arthur Wagner (Via email: arthur.wagner@activeinternational.com)
       Mr. Mel Lazar (Via email: mlazar@melvinlazar.com)
       Mr. Gary Steinbeck (Via email: gary.steinbeck@activeinternational.com)
       Mr. Daniel Winikka, Esq. (Via email: danw@lfdslaw.com)